UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHERRI SHERROD,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      No. 1:19-cv-02233-JRS-DML
                                         )
ALLISON TRANSMISSION, INC.,              )
                                         )
            Defendant.                   )

**Order on Defendant's Motion for Summary Judgment (ECF No. 20)**

*Pro se* Plaintiff Sherri Sherrod brings claims of race, sex, religion, age, and disability discrimination and retaliation against Defendant Allison Transmission, Inc., pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and the Age Discrimination in Employment Act of 1967 ("ADEA").  (Compl., ECF No. 1.)  She seeks "lost wages, pain and suffering, attorney's fees, punitive damages, and intangibles," (*id.* at 3), alleging retaliation "through written warnings, increased discipline, suspensions without pay, settlement of suspensions without pay, removal of duties, denying vacation time, intimidation, termination, and denial of unemployment claim," (*id.* at 2).  Attached to her complaint was a Dismissal and Notice of Rights to Sue issued on March 5, 2019.  (2018 Right to Sue, ECF No. 1-1; *see also* ECF No. 20-2 at 32.)  Defendant has moved for summary judgment.  (ECF No. 20.)  Plaintiff has filed an Opposition to Motion for Summary Judgment ("Opposition") stating that she "received disparate treatment being discriminated against because of my race (African American), sex, religion (Seventh-day

Adventist), age (57), disability, and retaliation for previously filing an EEOC charge and an earlier lawsuit in 2014 . . . creating a hostile work environment." (ECF No. 23 at 2.) Defendant has filed a Reply in Support of Its Motion for Summary Judgment. (ECF No. 24.) Defendant's motion thus being fully briefed, is ripe for decision. Having carefully considered the motion, response, reply, evidence, and applicable law, the Court concludes that Defendant's Motion for Summary Judgment, (ECF No. 20), should be **granted** for the following reasons.

## I. Background

In October 2006, Sherrod began working at Allison Transmission, Inc. ("Allison"), becoming a permanent employee in 2008. (Sherrod Dep. Tr. 44:19–25, ECF No. 20-1; ECF No. 23 at 3.) Following several disciplinary actions issued against Sherrod, and Sherrod's various charges of discrimination leveled against Allison, Allison ultimately discharged her in January 2019, (Pence Decl. ¶ 67, ECF No. 20-3 at 12), setting the stage for this lawsuit.

Allison manufactures commercial-duty automatic transmissions and hybrid propulsion systems for on-highway trucks and buses, off-highway vehicles, and equipment and military vehicles. (Pence Decl. ¶ 3, ECF No. 20-3 at 1.) Allison employs approximately 3,100 employees in the United States, including approximately 1,500 hourly employees in Indianapolis who are represented by the union United Automobile, Aerospace and Agricultural Implement Workers of America's local chapter 933 ("UAW 933"). (*Id.*)

During her employment at Allison, Sherrod was a member of UAW 933.  (Sherrod Dep. Tr. 45:2–6, ECF No. 20-1 at 5.)  Allison's Labor Relations Department ("Labor Relations"), which is part of Allison's Human Resources Department, is led by Matt McLaughlin, Executive Director of Human Resources.  (Pence Decl. ¶ 7, ECF No. 20-3 at 2.)  Labor Relations is responsible for the administration of Allison's collective bargaining agreement with UAW 933, and the enforcement of the Shop Rules and other policies and procedures applicable to bargaining unit employees, such as Sherrod.  (Id. ¶ 5.)  Two collective bargaining agreements were in place while Sherrod worked at Allison.  Allison's current collective bargaining agreement with UAW 933 is effective from December 18, 2017, through November 14, 2023 ("2017 Agreement").  (Id. ¶ 11; see also 2017 Agreement, Ex. I, ECF No. 20-3 at 15–41.)  The prior agreement had been in effect since December 3, 2012 ("2012 Agreement").  (Pence Decl. ¶ 12; see also 2012 Agreement, Ex. II, ECF No. 20-3 at 42–70.)

Allison generally follows a system of progressive discipline, which is set forth on the Paragraph 76 Notice of Disciplinary Action ("DA") form provided to bargaining unit employees when disciplinary issues arise.  (Pence Decl. ¶ 13, ECF No. 20-3 at 3; Paragraph 76 Notice of Disciplinary Action, Ex. III, ECF No. 20-3 at 71.)  Bargaining unit employees are subject to discipline for violations of Allison's Shop Rules, (see Shop Rules, Ex. IV, ECF No. 20-3 at 72), and other applicable policies, (Pence Decl. ¶ 14, ECF No. 20-3 at 3), and the disciplinary options ranged from a reprimand to termination of employment,[1] (id. ¶ 13).  In the case of more serious Shop Rule or

---

[1] Under the "Discipline" column of the Notice of Disciplinary Action form, there are eight levels of discipline, which increase in severity.  The levels, in order of least severe to most,

policy violations, discipline may begin at a higher level, up to and including termina-tion. (*Id.* ¶ 15.) For example, for violations of Shop Rule 14, discipline begins with at least a balance-of-shift suspension. (*Id.*; *see also* Shop Rules, Ex. IV, ECF No. 20-3 at 72) ("Shop Rule 14: Refusal or failure to do job assignment").) Under Paragraph 76(b) of the 2012 Agreement and the 2017 Agreement, an instance of discipline will be removed from an employee's record eighteen months after it issues. (Pence Decl. ¶ 16, ECF No. 20-3 at 3; *see also* 2017 Agreement, Ex. I, ECF No. 20-3 at 33; 2012 Agreement, Ex. II, ECF No. 20-3 at 61.)

Allison has forty Shop Rules. (*See* Shop Rules, Ex. IV, ECF No. 20-3 at 72.) When a supervisor or Area Manager believes that a bargaining unit employee has violated Allison's Shop Rules or other applicable policy, the employee is scheduled for a disci-plinary interview ("DI"). (Pence Decl. ¶ 17, ECF No. 20-3 at 3.) During the DI, the employee and his or her union representative has an opportunity to tell their side of the story before discipline issues. (*Id.*) For lower-level violations, the employee's supervisor conducts the DI. (*Id.* ¶ 18.) However, for higher-level violations, such as when an employee faces a balance-of-shift plus one-week suspension, either the su-pervisor or a member of Labor Relations conducts the DI. (*Id.*) And, when an em-ployee faces termination, a member of Labor Relations conducts the DI. (*Id.*)

---

are: reprimand; written warning #1; written warning #2; balance-of-shift suspension ("BOS"); BOS + 1 day; BOS +3 days; BOS + 1 week; and discharge. (DA, Ex. III, ECF No. 20-3 at 71.) Likewise, under the "Attendance Improvement Steps" column of the form, there are six lev-els: written warning #1; written warning #2; BOS + 1 week; BOS + 2 weeks; BOS + 30 days; and discharge. (*Id.*)

The 2012 Agreement and the 2017 Agreement each address vacation entitlements. (*See generally* 2017 Agreement, ECF No. 20-3 at 34–38; 2012 Agreement, ECF No. 20-3 at 63–67.)  When eligible, employees may use vacation restricted time ("VR time") for absences.  (2017 Agreement ¶ 194, ECF No. 20-3 at 36; 2012 Agreement ¶ 194, ECF No. 20-3 at 65.)  Allison may grant, upon prior approval, the use of VR time for periods of absence less than four continuous hours.  (2017 Agreement ¶ 194; 2012 Agreement ¶ 194.)  Bargaining unit employees, through their union representatives, may bring grievances to challenge discipline or to allege other contractual violations.  (2017 Agreement, ECF No. 20-3 at 20–25; 2012 Agreement, ECF No. 20-3 at 48–53.)  Grievances that are not resolved between Allison and the Union may be taken to arbitration.  (2017 Agreement ¶ 39, ECF No. 20-3 at 22; 2012 Agreement ¶ 39, ECF No. 20-3 at 50.)

From December 2010 until her termination, Sherrod worked on the day shift as a Fabricating Machining Specialist ("FMS Operator") in Department 2F40 in Allison's Plant 12.  (Sherrod Dep. Tr. 46:9–47:19, ECF No. 20-1 at 6–7.)  Jeff Pence, a member of Labor Relations Staff beginning in 2007, was the Labor Relations Representative for Plant 12 from March 1, 2017, through April 3, 2019.  (Pence Decl. ¶¶ 2, 4, ECF No. 20-3 at 1.)  Department 2F40 is divided into several different cells in which transmission parts are processed through a series of machines, (Sherrod Dep. Tr. 48:18–49:11, ECF No. 20-1 at 8–9), and as an FMS Operator, Sherrod worked on processing those transmission parts, (*id.* at 48:13–48:17, ECF No. 20-1 at 8–9).  Typically, when

Sherrod worked her day shift in Department 2F40, there were four to five FMS Operators, including Sherrod, as well as a job setter.  (*Id.* at 49:14–50:7, ECF No. 9–10.)

Sherrod's shift was regularly scheduled for Monday through Friday, from 6:30 a.m. to either 2:30 p.m. or 3:00 p.m. (*Id.* at 47:17–48:3, ECF No. 7–8.)  At times, her department worked either an expanded weekday shift or a Saturday shift.  (Pence Decl. ¶ 21, ECF No. 20-3 at 4.)  These shifts are referred to as "Plan A" shifts, a reference to part of a Memorandum of Understanding ("MOU") between Allison and UAW 933.  (*See* MOU, Ex. V, ECF No. 20-3 at 73–75.)  Saturday Plan A shifts ("Plan A Saturday") may be scheduled by the plant director for a variety of reasons, such as heightened customer demand, having a crucial machine down during the week and needing to make up for lost production time, or a delay by a supplier providing raw material for production. (Pence Decl. ¶ 22, ECF No. 20-3 at 4.)  Plan A Saturdays are scheduled on an ad hoc basis and are generally announced on the Wednesday before the Saturday on which they are to be worked.  (*Id.* ¶ 23.)

Under the MOU, an employee who has scheduled vacation on the Friday before, or the Monday after, a Plan A Saturday must be excused from working the Saturday shift.  (*See* 2017 Agreement, ECF No. 20-3 at 29; 2012 Agreement, ECF No. 20-3 at 57.)  Generally, in February, employees are required to make vacation requests for the entire year.  (2017 Agreement, ECF No. 20-3 at 38; 2012 Agreement, ECF No. 20-3 at 66.)  However, supervisors do allow employees to schedule vacation over the course of the year, as circumstances permit.  (Pence Decl. ¶ 26, ECF No. 20-3 at 5.)  Vacation requests are approved or disapproved on a department-by-department basis

6

based on seniority and operational needs.  (*Id.* ¶ 27.)  Similarly, in the event more employees apply for time off than can be spared from the job at a given time, vacation is awarded according to seniority.  (2017 Agreement ¶ 202e, ECF No. 20-3 at 38; 2012 Agreement ¶ 202e, ECF No. 20-3 at 66.)  But, once an employee is given a written disposition of their vacation time off request, approved vacation time cannot be changed without the mutual consent of Allison and the employee. (2017 Agreement ¶ 202f, ECF No. 20-3 at 38; 2012 Agreement ¶ 202f, ECF No. 20-3 at 67.)

Sherrod is a life-long, practicing Seventh Day Adventist.  (Sherrod Dep. Tr. 57:9–25, ECF No. 20-1 at 17; ECF No. 23 at 3.)  In 2013, she first informed Allison management that working during the period of sundown on Friday evening to sundown on Saturday evening was contrary to her religious beliefs.  (Pence Decl. ¶ 29, ECF No. 20-3 at 5.)  Subsequently, on several occasions, representatives of Allison's Labor Relations Department met with Sherrod and her UAW 933 representatives to discuss and review accommodations that would allow her to avoid working mandatory overtime on Plan A Saturdays.  (Pence Decl. ¶ 30, ECF 20-3 at 6.)

Allison offered Sherrod the following accommodations: (1) using available vacation on a Friday or Monday preceding or following a Plan A Saturday, consistent with Allison's collectively-bargained vacation policies; (2) having a qualified co-worker fill in for Sherrod on Plan A Saturdays; or (3) using her seniority to transfer to another shift or another department where Plan A Saturdays are infrequent. (*See* Pence Notes to Sherrod, Ex. VI, ECF No. 20-3 at 76; McLaughlin Email, Ex. VII, ECF No. 20-3 at 77; *see also* Pence Decl. ¶ 31, ECF No. 6; Sherrod Dep. Tr. 69:1–10, 82:11–21, 173:4–

7

11, ECF No. 20-3 at 26, 39, 115.)  Additionally, during periods for which there were six employees on day shift in Department 2F40, and there was sufficient coverage without Sherrod, Allison excused her from Plan A Saturdays without the need to find another hourly worker to cover the shift.  (Kaminski Decl. ¶¶ 4–5, Ex. D, ECF No. 20-4 at 1–2.)

Sherrod also proposed that she be excused from working any Plan A Saturday and/or she be allowed to work after sundown on Plan A Saturdays, (Sherrod Dep. Tr. 175:6–177:7, ECF No. 20-1 at 116–18; *see also* Pence Decl. ¶ 35, ECF No. 20-3 at 7), after Allison Management asked Sherrod if she had any additional suggestions for it to consider, (*see* Ex. VI, ECF No. 20-3 at 76).  However, Allison informed Sherrod that it would not accept her proposed accommodations because allowing her to be excused from every Plan A Saturday would result in inadequate staffing in some instances, (Pence Decl. ¶ 36, ECF 20-3 at 7), and because no shift existed after sundown on Plan A Saturdays—and her department could not operate with only one person, (*id.* ¶ 37, ECF No. 20-3 at 7).

On July 26, 2013, Sherrod filed a charge of discrimination against Allison with the Equal Employment Opportunity Commission (EEOC) ("First Charge").  (ECF No. 20-2 at 21.)  Sherrod's First Charge alleged that Allison discriminated against her on the basis of her race, sex, and religion, and that she was denied a religious accommodation, all in violation of Title VII.  (*Id.*)  With a Dismissal and Notice of Rights letter in hand following the EEOC's dismissal of the First Charge, , Sherrod, by her then-counsel, brought suit in federal court for race, sex, and religion discrimination against

Allison pursuant to Title VII on March 14, 2014.  (Complaint, *Sherrod v. Allison Transmission*, No. 1:14-cv-00411-TWP-MJD (S.D. Ind.); *see also* ECF No. 20-2 at 22–26.)  On January 13, 2015, Sherrod and Allison entered into a confidential settlement agreement under which Sherrod released all claims against Allison and agreed to dismiss the suit with prejudice.  (Mediation Report to Court, *Sherrod*, No. 1:14-cv-00411-TWP-MJD; *see also* Sherrod Dep. Tr. 88:10–92:10, ECF No. 20-1 at 45–49.)  On February 5, 2015, the Court dismissed the suit.  (Order, *Sherrod*, No. 1:14-cv-00411-TWP-MJD; *see also* Sherrod Dep. Tr. 88:10–92:10, ECF No. 20-1 at 45–49.)

For more than three years following the dismissal of the 2014 lawsuit, Sherrod remained employed with Allison and filed no additional charges or lawsuits against Allison.  (Sherrod Dep. Tr. 92:20–25, ECF No. 20-1 at 49.)  However, Sherrod received several disciplinary actions from 2017 through the date of her termination, which led to her bringing the current suit.

First, on March 25, 2017, Sherrod received a disciplinary action because she did not find a suitable replacement for her scheduled Plan A Saturday.  (March 25, 2017, DA, ECF No. 20-2 at 54; Pence Decl. ¶ 43, ECF No. 20-3 at 8; Sherrod Dep. Tr. 191:5–12, ECF No. 20-1 at 132.)  Vacation was unavailable that day due to other employees' previously granted vacation requests.  (Pence Decl. ¶ 43, ECF No. 20-3 at 8; Sherrod Dep. Tr. 191:5–12, ECF No. 20-1 at 132.)  As a result, Peter Kaminski, Sherrod's direct supervisor from January 2017 to August 2017, issued her a reprimand for the unexcused absence, which was a violation of Shop Rule 6.  (March 25, 2017, DA, ECF No. 20-2 at 54; *see also* Sherrod Dep. Tr. 189:3–24, ECF No. 20-1 at 130.)  In this

9

instance, Sherrod and her UAW 933 representative waived the DI, and in return, Allison agreed to purge the discipline from her disciplinary record as of May 15, 2017—more than sixteen months before the discipline would have otherwise been eligible to be removed.  (Sherrod Dep. Tr. 193:24–196:9, ECF No. 20-1 at 134–36; Pence Decl. ¶ 44, ECF No. 20-3 at 8.)

Second, on October 3, 2017, Sherrod failed to check one in every five parts on machine, as required; consequently, she ran several bad parts before the problem was discovered.  (Sherrod Failure to Check, Ex. VIII, ECF No. 20-3 at 79.)  In addition, she failed a 100% check on the burnisher that left the hub out of tolerance.  (*Id.*; October 3, 2017, DA, ECF No. 20-2 at 55.)  John Hooker, Sherrod's direct supervisor from September 2017 to January 2018, issued her a balance-of-shift suspension for violating Shop Rule 14 by failing to do a job assignment.  (October 3, 2017, DA, ECF No. 20-2 at 108; *see also* Sherrod Dep. Tr. 199:8–19, ECF No. 20-1 at 140.)  Because she violated Shop Rule 14, the discipline progressed immediately to a balance-of-shift suspension.  (Sherrod Dep. Tr. 199:16–200:2, ECF No. 20-1 at 140.)  Sherrod filed a grievance over the suspension, which Allison resolved on October 18, 2017, by agreeing to purge the discipline from her record on December 31, 2017— more than fifteen months before the discipline would have otherwise been eligible to be removed.  (*Id.* at 202:12–23, ECF No. 20-1 at 143; *see also* October 19, 2017, Grievance, ECF No. 20-2 at 47; Pence Decl. ¶ 47, ECF No. 20-3 at 9.)

Third, on November 6, 2017, Sherrod was working on a machine that faulted and required resetting; however, she failed to check and clear the machine before resetting it. (Pence Decl. ¶¶ 48–49, ECF No. 20-3 at 9; *see also* November 6, 2017, Actions, Ex. IX, ECF No. 20-3 at 80.)  When she restarted the machine, it was damaged due to a spindle that had continued to turn, which resulted in lost production during her shift and the following shift.  (Pence Decl. ¶¶ 48–49, ECF No. 20-3 at 9.)  On December 8, 2017, Hooker issued Sherrod a "balance-of-shift plus one day" suspension for violating Shop Rule 16 by engaging in careless workmanship on November 6.  (November 6, 2017, DA, ECF No. 20-2 at 56; *see also* Sherrod Dep. Tr. 205:22–206:13, ECF No. 20-1 at 147–48.)  Sherrod filed a grievance over the suspension, which Allison resolved by agreeing to remove the discipline from her record—sixteen months before the discipline would otherwise have been eligible to be removed.  (December 11, 2017, Grievance, ECF No. 20-2 at 46; *see also* Sherrod Dep. Tr. 209:12–210:8, ECF No. 20-1 at 150–51; Pence Decl. ¶ 50, ECF No. 20-3 at 9.)

Fourth, on November 11, 2017, Sherrod failed to identify an adequate replacement for that Plan A Saturday, and she was not able to schedule vacation due to another employee's previously scheduled vacation.  (Sherrod Dep. Tr. 223:7–226:16, ECF No. 20-1 at 164–67.)  Earlier in 2017, she had requested vacation for Friday, November 10, but her then-supervisor, Kaminski, denied the request due to a conflict with another employee's request for the same day.  (Kaminski Decl. ¶ 8, ECF No. 20-4 at 2.)  On December 11, 2017, Hooker issued Sherrod a "balance-of-shift plus three day" suspension for her unexcused absences on Saturday, November 11, and the following

11

Monday, November 13, 2017.[2]  (November 11, 2017, DA, ECF No. 20-2 at 57; *see also* Sherrod Dep. Tr. 222:11–223:6, ECF No. 20-1 at 163–64.)  Sherrod filed a grievance over the suspension, which Allison resolved by agreeing to purge it from her record— over eleven months before the discipline would otherwise have been eligible to be removed.  (Pence Decl. ¶ 53, ECF No. 20-3 at 10.)

Fifth, on January 22, 2018, for the second time that month, Sherrod arrived late for her shift.  (Pence Decl. ¶ 55, ECF No. 20-3 at 10; Sherrod Dep. Tr. 229:1–24, ECF No. 20-1 at 170.)  The first time she arrived late in January 2018, Hooker did not initiate a disciplinary action against her, but, rather, allowed her to use VR time to cover the tardiness and warned her not be late again.  (Jan. 2–22, 2018 Attendance Record, Ex. X, ECF No. 20-3 at 10.)  However, Sherrod did not have prior approval to use VR time to cover her tardiness on January 22, (*id.*); and on January 25, 2018, Hooker issued Sherrod a "balance-of-shift plus one week" suspension for violating Shop Rule 7 by arriving late for her shift on January 22.  (January 22, 2018, ECF No. 20-2 at 58; *see also* Sherrod Dep. Tr. 229:1–24, ECF No. 20-1 at 170.)  Sherrod filed a grievance over the suspension, which Allision resolved by agreeing to purge it from her disciplinary record—thirteen months before the discipline would otherwise have been eligible to be removed.  (January 29, 2018, Grievance, ECF No. 20-2 at 45; *see*

---

[2]While there seems to be agreement that a Saturday and the following Monday were involved, there also seems to be a discrepancy as to the dates.  The dates set forth herein are contrary to the dates set forth in the document but consistent with the agreed upon days of Saturday and Monday, which are also set forth in the documents, and with the dates those days of the week actually fell on the calendar.

*also* Pence Decl. ¶ 56, ECF No. 20-3 at 10; Sherrod Dep. Tr. 234:14–235:16, ECF No. 20-1 at 175–76.)

On March 2, 2018, Sherrod filed her second EEOC charge ("2018 Charge") against Allison, alleging that Allison discriminated against her on the basis of her race, sex, religion, and age, and that Allison had retaliated against her for filing the First Charge and the 2014 lawsuit. (2018 EEOC Charge, ECF No. 20-2 at 28–29; *see also* Sherrod 93:6–13, 95:5–14, ECF No. 20-1 at 50, 52.)  The charge indicated that the time frame for the alleged discrimination was March 25, 2017, through March 2, 2018.  (2018 EEOC Charge, ECF No. 20-2 at 28.)  A Dismissal and Notice of Rights to Sue was issued on March 5, 2019.  (2018 Right to Sue, ECF No. 1-1; ECF No. 20-2 at 32.)

Sixth, on April 3, 2018, Sherrod had checked off completing a "TAQC" chart for two machines but failed to record the underlying measurement for one machine. (Pence Decl. ¶ 57, ECF No. 20-3 at 10–11.)  On April 18, 2018, Pence conducted a DI pertaining to the incident.  (April 3, 2018, DI, Ex. XI, ECF No. 20-3 at 83–84.)  Sherrod did not deny failing to chart the measurements as required, but, instead, stated that she had not performed the job for six months and therefore should have received retraining.  (*Id.*; *see also* Sherrod Dep. Tr. 257:4–6, ECF No. 20-1 at 198.)  After recessing the DI to conduct further investigation, Pence noted on April 24, 2018, that Sherrod had not been truthful but in fact had run that job seven (7) times in the preceding 30 days, including on April 2, 2018, just the day before the incident on April 3, 2018.  (April 3, 2018, DI, Ex. XI, ECF No. 20-3 at 84.)  Under Allison's system of

progressive discipline, Sherrod was then eligible for termination, (Pence Decl. ¶ 61, ECF No. 20-3 at 11); however, after the DI, Pence instead issued Sherrod a "balance-of-shift plus one week" suspension for violating Shop Rule 14 by failing to do a job assignment on April 3.  (April 3, 2018, DA, ECF No. 20-2 at 59; Sherrod Dep. Tr. 256:11–24, ECF No. 20-1 at 197.)  Sherrod filed a grievance over the suspension, which Allison and UAW 933 settled by Allison agreeing to remove the discipline from her record one year from the date of the violation, rather than after the standard eighteen months.  (April 24, 2018, Grievance, ECF No. 20-2 at 50; *see also* Sherrod Dep. Tr. 257:7–261:18, ECF No. 20-1 at 198–202.)  The next month, Sherrod went on medical leave—from May 16, 2018, to January 8, 2019.  (Pence Decl. ¶ 64, ECF No. 20-3 at 12.)

The final incident occurred on January 23, 2019.  That day, during the afternoon shift, FMS Operator Benita Young, informed Josh Silver, Sherrod's direct supervisor at the time, that she had discovered twelve parts out of tolerance.  (Silver Decl. ¶ 5, Ex. E, ECF No. 20-5 at 1; *see also* Silver Email to Pence, ECF No. 20-5 at 3.)  After investigating the issue, Silver determined that Sherrod had failed to appropriately take a height measurement on every fifth piece, as required.  (Silver Decl. ¶ 6, ECF No. 20-5 at 2.)  After the incident, Sherrod went back on medical leave from January 31 to April 3, 2019.  (Sherrod Dep. Tr. 272:2–5, ECF No. 20-1 at 213; Pence Decl. ¶ 66, ECF No. 20-3 at 12.)  On the day Sherrod returned from leave, Pence conducted a DI for a potential violation of Shop Rule 16 on January 23, 2019.  (Pence Decl. ¶ 67, ECF No. 20-3 at 12.)  The DI revealed that had Sherrod performed the required check on

every fifth piece, there could not have been twelve consecutive bad parts run, and that even though some bad parts could have been run on the afternoon shift, she was at least responsible for missing at least one check.  (April 3, 2019, DI Notes, Ex. XII, ECF No. 20-3 at 85–86.)  After the DI, Labor Relations determined that Plaintiff had indeed violated Shop Rule 16, and Pence terminated her employment.  (Pence Decl. ¶ 69, ECF No. 20-3 at 13; Sherrod Dep. Tr. 271:6–20, ECF No. 20-1 at 212; ECF No. 20-2 at 60.)

On May 31, 2019, Plaintiff filed her third EEOC Charge ("2019 Charge") against Allison, alleging that Allison discriminated against her on the basis of her race, sex, religion, and age, and that Allison retaliated against her for filing the two previous charges of discrimination and 2014 lawsuit.  (2019 EEOC Charge, ECF No. 20-2 at 30; *see also* Sherrod Dep. Tr. 96:9–97:2, ECF No. 20-1 at 53–54.)  On September 10, 2019, a Dismissal and Notice of Rights to Sue was issued.  (2019 Right to Sue, ECF No. 20-2 at 33.)  And, on June 4, 2019, the Sherrod filed her *pro se* employment discrimination Complaint in this matter.  (Compl., ECF No. 1.)

The foregoing statement of facts, essentially unopposed by Sherrod and supported by admissible evidence, has been considered under the standard set forth below.

## II. Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists

of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). But the Court must also view the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual

16

assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 572—73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Failure to respond with admissible evidence may result in conceding the moving party's version of the events. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *see* S.D. Ind. L. R. 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence ... that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."). This does not alter the standard for assessing a Rule 56 motion, but it does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

### III. Discussion

Allison argues that summary judgment is warranted in this case because no reasonable jury could find, based on the undisputed facts, that Allison subjected Sherrod to disparate treatment or a hostile work environment on the basis of her race, sex, age or disability; failed to accommodate her religious beliefs under Title VII; or retaliated against her in violation of Title VII, the ADEA, or the ADA for filing EEOC charges and a previous discrimination lawsuit. The Court agrees with Allision for the following reasons.

*A. Procedural Issues*

As an initial matter, Allison asserts that Sherrod's Title VII and ADA claims based on incidents that occurred prior to May 6, 2017, and ADEA claims based on incidents that occurred prior to September 13, 2017, are time-barred due to the applicable limitations periods under Title VII, the ADA, and the ADEA, and that all claims up to and including January 13, 2015, are barred by the settlement and dismissal of her 2014 lawsuit.  Moreover, Allison asserts that Sherrod's ADA claims are barred for failure to exhaust administrative remedies.  The Court addresses each argument in turn.

<u>1. Time-Barred Claims</u>

"Title VII claims [and ADA] claims must be filed within 300 days of the alleged discriminatory act or unlawful practice." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 891 (7th Cir. 2016) (citing 42 U.S.C. § 2000e–5(e)(1) (Title VII statute of limitations)); *see also* 42 U.S.C. § 12117(a) (ADA).  ADEA claims must be filed within 180 days of the alleged discriminatory act or unlawful practice.  29 U.S.C. § 626(d)(1)(A); *see also Daugherity v. Traylor Bros.*, 970 F.2d 348, 350 n.2 (7th Cir. 1992) (stating that because Indiana is not a "deferral state" with respect to claims of age discrimination, the 180-day period is applicable).  Here, Sherrod filed a second EEOC charge on March 2, 2018.  (2018 EEOC Charge, ECF No. 20-2 at 28–29.)  Therefore, any alleged Title VII and ADA violations that occurred prior to May 6, 2017, or any alleged ADEA violations that occurred prior to September 3, 2017, are time-barred.

19

Any claims that Sherrod asserts based on events that occurred prior to January 13, 2015, are further barred, waived, or precluded because those claims were previously dismissed with prejudice, (Order, *Sherrod*, No. 1:14-cv-00411-TWP-MJD), after Sherrod entered into a settlement agreement with Allison in the 2014 lawsuit, (Mediation Report to Court, *Sherrod*, No. 1:14-cv-00411-TWP-MJD; *see* ECF No. 23-5). *See Brooks-Ngwenya v. Indianapolis Pub. Schs.*, 564 F.3d 804, 809 (7th Cir. 2009) (settlement that stipulates to dismissal with prejudice, "is a final judgment for purposes of claim preclusion").

### 2. Failure to Exhaust in ADA Claims

To recover for violations of the ADA, "a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged violation . . . ." *Stewart v. Cnty. of Brown,* 86 F.3d 107, 110 (7th Cir.1996) (citing 42 U.S.C. § 12117(a)). However, "A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if [her] allegations fall within the scope of the charges contained in the EEOC complaint." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000) (quoting *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir.1996) (internal quotations omitted)). "To determine whether the allegations in the complaint fall within the scope of the earlier EEOC charge, [courts] must look at whether the allegations are 'like or reasonably related to' those contained in the charge." *Id.* (internal quotations omitted).

Here, Sherrod's ADA claims are not at all like or reasonably related to those in her charges.  Thus her ADA claims fail because she did not exhaust her administrative remedies.  Indeed, she failed to check the box for "disability discrimination" on either her 2018 EEOC Charge or her 2019 EEOC Charge, and she also failed to allege disability discrimination in the body of either charge.  (*See* 2018 EEOC Charge, ECF No. 20-2 at 28; 2019 EEOC Charge, ECF No. 20-2 at 30.)  In fact, there is no mention that she suffered from any disability, much less that she was discriminated against due to any disability.  Moreover, as noted, Sherrod's allegations here are not "like or reasonably related to" the actions contained in either EEOC charge, which comprise being made to work on Saturdays in violation of her religious beliefs, and being reprimanded for machine breakdowns because of her age, sex, race, and religion, and in retaliation for her complaints to the EEOC and in federal court..  In a nutshell, Sherrod now alleges, as best the Court can discern, that, after she suffered a hamstring injury, Joe Hornet, her area manager at the time, (ECF No. 20-1 at 15, 16), removed chairs and mats from her work area to further injure her, which allegedly led her to have knee surgery in 2014.  (Pl's Resp. Interrog., ECF No. 20-2 at 89–90.)  These allegations, which apparently occurred around 2014, are not only unrelated to any allegations in either the 2018 EEOC charge or the 2019 EEOC charge, but are waived, *see supra* Section III.A.1.  Sherrod also points to a post-settlement incident wherein she alleges without further support that Kaminski asked her why she was sitting, allegedly to relieve her knee pain, but she was not disciplined for sitting or otherwise

harassed.  (ECF No. 20-1 at 234–38.)   She cites to no evidence of disability discrimination in this regard.  Also, her narrative Opposition is wholly devoid of evidence or rebuttal concerning failure to exhaust her administrative remedies, or of any mention of surgeries, removed chairs/mats, or comments about sitting—and to that extent, she appears to have abandoned or conceded this claim and has otherwise failed to rebut Defendant's arguments, (ECF No. 23).  *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  In any event, either for failure to exhaust or for being barred by her prior settlement, Allison's Motion for Summary Judgment is **granted** as to Sherrod's ADA claims.  Nonetheless, the Court will analyze Sherrod's ADA claims throughout this Order in the alternative, leading to the conclusion that even if Sherrod's ADA claims are not barred, they still fail for the reasons that follow.

### B. Disparate Treatment Claims

To survive summary judgment on a Title VII, ADA or ADEA disparate treatment claim, the "legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterps, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Unlike Title VII, however, under the ADEA and ADA, "it's not enough to show that age [or disability] was *a* motivating factor.  The plaintiff must prove that, but for his age [or disability], the adverse action would not have occurred." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455

22

(7th Cir. 2009)); *see also Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) ("Like the ADEA, the ADA . . . require[s] a showing of but-for causation.").

The Seventh Circuit has made clear that all relevant evidence must simply be considered "as a whole." *Ortiz*, 834 F.3d at 763. A plaintiff can prove a disparate treatment claim by either establishing a *prima facie* case for discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or, alternatively, by pointing to enough circumstantial evidence that would allow a reasonable jury to infer that a decision was attributable to discriminatory motivations, *see David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

### C. *Prima Facie* Case

To prove a *prima facie* case for race, sex, religious, age, or disability discrimination under the *McDonnell Douglas* burden-shifting framework, a plaintiff must show "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019) (quoting *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017)). If a plaintiff establishes a *prima facie* case, then the burden will shift to the defendant to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If the defendant successfully rebuts the plaintiff's *prima facie* case, then the burden will

shift back to the plaintiff, "who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.*

Allison argues that Sherrod fails to make out a *prima facie* case for race, sex, religious, age, or discrimination because she did not meet its legitimate performance expectations and because she cannot present sufficient evidence that similarly situated employees outside of her protected class were treated more favorably. Allison is correct.

First, the undisputed facts show that Sherrod was a member of a protected class— e.g., 57-year-old, African American, female—and that Sherrod suffered an adverse employment action—e.g., termination. To meet her burden, though, Sherrod must establish that there is a genuine question of material fact as to whether she met Allison's legitimate performance expectations. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 887 (7th Cir. 2001). Despite her protestations to the contrary, the undisputed facts show that Sherrod displayed repeated performance, attendance, and disciplinary issues, resulting in the violation of several Shop Rules. On October 3, 2017, Sherrod violated Shop Rule 14 by failing to check one in every five transmission parts, which resulted in her running several bad parts. On November 6, 2017, she violated Shop Rule 16 by failing to clear a machine before resetting it, resulting in damage to the machine and lost production.

Moreover, on November 11, 2017, she violated Shop Rule 6 by failing to find a replacement or request vacation for her Plan A Saturday, which resulted in an unexcused absence that day, as well as the following Monday. On January 22, 2018, she

violated Shop Rule 7 because she was late for work.  On April 3, 2018, she again violated Shop Rule 14 by failing to record a measurement on a machine, despite checking off on the TAQC chart that she had done so.  And, on January 23, 2019, she again violated Shop Rule 16 by failing to appropriately take a height measurement on every fifth piece, as required, which resulted in running twelve bad parts.  The aforementioned disciplinary violations show that Sherrod failed to meet Allison's legitimate expectations, and she has not met her burden of showing otherwise.

In any event, Sherrod has also failed to meet her burden in showing that a similarly situated person to her was treated more favorably than her by Allison.  "To meet her burden of demonstrating that another employee is "similarly situated," a plaintiff must show that there is someone who is directly comparable to her in all material respects.  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  "The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a common-sense examination."  *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013).  "The similarly-situated inquiry is flexible, common-sense, and factual.  It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'"  *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (quoting *Coleman*, 667 F.3d at 841). Hence, there is no "magic formula" for the similarly-situated inquiry.  *Id.*  "Examples of evidence that would be required in the usual case . . . [include] whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) 'engaged in similar conduct without such differentiating

or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (citing *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Here, Sherrod cannot point to any admissible evidence showing that similarly situated white, male, younger, non-Seventh Day Adventist and/or non-disabled coworkers were treated more favorably.  All of her purported comparators other than a trainee were also in the protected age class, and no evidence has been adduced concerning whether any of the comparators are either disabled or Seventh Day Adventists.  Sherrod points to only a few examples where she alleges that similarly situated coworkers were being treated more favorably than her—all of these examples are not only inapt, but also purely speculative, unsupported by any admissible evidence.  For instance, Sherrod alleges that she was "singled out and treated less favorably than [her] younger white male coworkers," (ECF no. 23 at 2); that "[Robert Ward] also told [her] that three other people" had a machine crash on them, and when she "asked if they got written up for it and he said no," (ECF No. 23 at 8); that when she slowly removed a part from a "constraint machine" and was written up for it, her "white, younger coworkers" were not for doing the same action, (Pl's Resp. Interrog., ECF No. 20-2 at 81); and that on January 23, 2019, "Kay Young had the same crash and the machine was down for the whole day . . .  and to [her] knowledge no one was written up," (ECF No. 20-2 at 36).

Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact

26

finder could conclude that the plaintiff met his burden on this issue. *See Coleman*, 667 F.3d at 846–47. Here, however, the Court finds that Sherrod has not met her burden of showing that white, male, younger, non-Seventh Day Adventist and/or non-disabled coworkers were treated more favorably than her, because viewing the evidence "through the prism of the substantive evidentiary burden," *Anderson*, 477 U.S. at 254, all of Sherrod's examples rely on speculative inferences, baseless opinions, or inadmissible hearsay. Indeed, she provides no admissible evidence to support any of her statements, because inferences and opinions must be premised on personal experience, *see Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)—but must be more than mere conclusions or unsupported inferences, *see Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018)—and inadmissible hearsay[3] evidence may not be considered on summary judgment, *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *see also* Fed. R. Civ. P. 56(c)(2).

Moreover, even if Sherrod had met her burden of demonstrating that another employee was similarly situated, the undisputed facts show that the alleged similarly situated employees were in fact *not* treated differently. Sherrod alleges that Kevin

---

[3] Indeed, several of Sherrod's assertions rely on her own account of her coworkers' out-of-court statements to establish the truth of the matter asserted. Those assertions, (*see, e.g.*, ECF No. 23 at 8; Sherrod Dep. Tr. 77:18–23, 305:1–19, ECF No. 20-1 at 34, 246), are therefore hearsay with no exception. *See* Fed. R. Evid. 801. To the extent that Sherrod argues that those statements are statements by a party opponent, *see* Fed. R. Evid. 801(d), those statements are inadmissible because they come from coworkers and not representatives of Allison, *see id.*

Canary,[4] Patrick Liphard (over 40 years old),[5] Robert Ward (over 40 years old), Darrell Yates (over 40 years old), Mike Kaiser (over 40 years old), and Michael Mansfield (over 40 years old)[6] "didn't get written up."  (ECF No. 20-2 at 36; *see also* Sherrod Dep. Tr. 263:1–267:25, 305:1–324:17, ECF No. 20-1 at 204–08, 246–265.)  But Sherrod fails to provide admissible evidence to back her allegations, (*see* Sherrod Dep. Tr. 310:20–311:2, 314:7–315:3, 316:5–317:12, 319:6–320:9, 324:8–17, ECF No. 20-1 at 251–52, 255–56, 257–58, 261–62, 265–66), that these purported comparators were either proper comparators or treated differently by, for example, escaping discipline when warranted.  Rather, the evidence shows that from 2017 to the start of this litigation, Allison did in fact discipline Sherrod's alleged comparators for similar misconduct.  For example, Robert Ward received disciplinary actions for violations of Shop Rules 6, 14, and 16, (*see* Ward SR 6 DA, ECF No. 20-3 at 94; Ward SR 14 DA, ECF No. 20-3 at 93; Ward SR 16 DA, ECF No. 20-3 at 96); Darrell Yates received disciplinary actions for violations of Shop Rules 6 and 7, (*see* Yates SR 6 DA, ECF No. 20-3 at 89, Yates SR 6 DA's, ECF No. 20-3 at 90–92); and Kaiser received disciplinary actions for violations of Shop Rules 6 and 7, (*see* Kaiser SR 6 DA, ECF No. 20-3 at 88,

[4] Kevin Canary is not similarly situated to Sherrod because he was a new employee and in training in 2018, and because Sherrod admits to not having evidence that he was treated differently on account of his race, gender, religion, lack of disability, or lack of religious accommodation.  (Sherrod Dep. Tr. 263:1–267:25, ECF No. 20-1 at 204–08.)

[5] Patrick Liphard is not similarly situated to Sherrod because he is over forty years old, (Pence Decl. ¶ 74, ECF No. 20-3 at 13), and because Sherrod has not provided admissible evidence to show that he was supervised by the same person as her, subject to the same standards as her, and that he engaged in similar conduct as her.

[6] Michael Mansfield is not similarly situated to Sherrod because he is older than her, (Sherrod Dep. Tr. 121:4–7, ECF No. 20-1 at 63), and worked as a union official, which means that he was not supervised by the same person as her, subject to the same standards as her, and did not engage in similar conduct as her.

Kaiser SR 7 DA, ECF No. 20-3 at 89). Simply, Sherrod presents no admissible evidence that any alleged similarly situated employees were treated differently than her during the timeframe she worked in Department 2F40.

Therefore, Sherrod has failed to establish a *prima facie* case for race, sex, religious, age, or disability discrimination under the *McDonnell Douglas* burden-shifting framework. This is enough to find against her claims of discrimination. But even if she had succeeded in establishing a *prima facie* case, Allison argues that it had legitimate, nondiscriminatory reasons for issuing each of the disciplinary actions—namely, well-documented absenteeism and unsatisfactory performance. Because Allison's reasons are indeed legitimate and nondiscriminatory,[7] s*ee Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (absenteeism); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (poor performance), if Sherrod had established a *prima facie* case for discrimination, she must demonstrate that Allison's reasons were pretextual, which she fails to do.

"In determining whether an employer's stated reason is pretextual, '[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether

---

[7] The Court notes that, because Allison had legitimate, nondiscriminatory reasons—absenteeism and poor performance—for issuing disciplinary actions against Sherrod, it seems to be the case that Sherrod was not qualified to perform the essential functions of her job under the ADA. Under the ADA, Sherrod must meet the threshold question of establishing whether she is a "qualified individual with a disability" through evidence that she is disabled within the meaning of the ADA and is qualified to perform the essential functions of the job with or without reasonable accommodation. *Timmons v. Gen. Motors, Corp.*, 469 F.3d 1122, 1127 (7th Cir.2006) (citing 42 U.S.C. §§ 12102(2),12111(8), 12112)). Regardless of whether Sherrod can show she is disabled within the meaning of the ADA, she has not shown she is qualified to perform the essential functions of her job. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863 (7th Cir. 2005).

the employer honestly believed the reason it has offered to explain the discharge.'"
*Robertson v. Wisc. Dept. of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020) (quoting
*Harper*, 687 F.3d at 311 (alteration in original)).   "To meet this burden, [Sherrod]
therefore 'must identify such weaknesses, implausibilities, inconsistencies, or contra-
dictions' in [Allison's] stated reason that would permit a reasonable person to con-
clude that the stated reason was 'unworthy of credence.'"   *Id.* (quoting *Boumehdi v.
Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Here, Sherrod does not point to any admissible evidence to show that Allison did
not honestly believe it discharged her for absenteeism and unsatisfactory perfor-
mance, as evidenced by her admissions of not having any evidence of pretext, (*see,
e.g.*, Sherrod Dep. Tr. 203:11–205:14, 216:24–218:25, 222:4–8, 228:9–25, 270:12–
271:5, ECF No. 20-1 at 144–46, 157–59, 163, 169–71), and her bald assertions that
she did not misbehave or otherwise warrant any discipline or discharge (*see, e.g.,* ECF
No. 20-1 at 153-56; ECF No. 23 at 7-10).   But even if the evidence she provides, for
the most part by way of mere speculative narrative, (*e.g.*, ECF No. 23 at 7–10), were
admissible, that evidence is insufficient to permit a reasonable person to conclude
that Allison's stated reasons were unworthy of credence.   For example, she admits
that she did not know what Hooker honestly believed about the incident on November
6, 2017, which led to her receiving a DA, (Sherrod Dep. Tr. 212:8–215:20, ECF No.
20-1 at 153–56); and she admits that she did not know what Pence or Silver honestly
believed regarding who was at fault for the bad parts on January 23, 2019, which
ultimately led to her termination, (Sherrod Dep. Tr. 276:4–277:13, 281:16–25, ECF

No. 20-1 at 217–18, 222).  Simply, even if Sherrod had been able to establish a *prima facie* case for discrimination, then her claim would still fail for the inability to demonstrate that Allison's reasons were pretextual.

Even more detrimental to her disparate treatment claims, however, is the fact that Sherrod seems to rely on personal belief and "speculation and conjecture" about Allison's possible motives, "which is not enough to survive summary judgment." *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019).  Her evidence "must point directly to a discriminatory reason for the employment action . . .  and be directly related to the employment decision." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012).  But it does not.  Rather, she has merely offered "an amorphous litany of complaints about a myriad of workplace decisions." *Gorence v. EagleFood Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

In sum, the undisputed material facts preclude a reasonable jury from finding that Sherrod's race, sex, or religious discrimination was a motivating factor in any adverse employment action by Allison during the relevant period.  Likewise, the undisputed material facts would *not* preclude a reasonable jury from finding that but for Plaintiff's age or disability, any adverse action by Allison during the relevant period would not have occurred.  Thus, Allison's Motion for Summary Judgment is **granted** as to Sherrod's Title VII, ADA, and ADEA disparate treatment claims.[8]

---

[8] Based on the Court's analysis in this Section, it is also clear that Sherrod has failed to point to enough circumstantial evidence that would allow a reasonable jury to infer that a decision was attributable to discriminatory motivations, *see David*, 846 F.3d at 224, and has therefore failed to create any genuine issue of material fact as to her alleged discrimination, *see Ortiz*, 834 F.3d at 765.

### D. Hostile Work Environment Claim

Title VII prohibits an employer from creating a "hostile or abusive work environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). To prevail on a hostile work environment claim, a plaintiff must demonstrate four elements: "(1) the employee was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII [ ]; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability." *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019) (citing *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015)).

Allison argues that Sherrod's hostile work environment claims fail because she cannot prove that any alleged harassment was based on her membership in a protected class. Sherrod responds by offering several examples of encounters that she believes show she was subject to a hostile work environment. Even when framed in the way Sherrod wants, these examples do not show a hostile work environment. For instance, Sherrod alleges that her former supervisor, Jake Jones, "defame[d] her work ability" and said she "didn't produce as much as [her] coworkers," (ECF No. 23 at 6), but she admitted that she did not believe Jones discriminated against her on the basis of race, sex, religion, or disability—only that he attacked her work ethic, (Sherrod Dep. Tr. 126:7–128:3, 136:9–19, ECF No. 20-1 at 68–70, 77).

Sherrod also alleges that her former supervisors, Peter Kaminski and Virgil Eiteljorg, were "riding her back," (ECF No. 23 at 6); that Kaminski attempted to write her

32

up for missing a Plan A Saturday, (*id.* at 6–7); that Kaminski did not allow her to take a break until the bell rang, (*id.*); and that, on May 23, 2017, Kaminski asked her to sweep the floor, which made her feel light headed and short of breath, resulting in her going to the hospital, (*id.*).  However, regarding these interactions with Kaminski and Eiteljorg, Sherrod fails to identify any admissible evidence to show that their treatment of her was based on her sex, religion, age, or disability.  (*Cf.* Kaminski Decl. ¶ 11, ECF No. 20-4 at 3).  Moreover, she admits that she has no knowledge of Kaminski's interactions with her coworkers, (Sherrod Dep. Tr. 158:3–161:2, ECF No. 20-1 at 99–102); that she has no evidence to show that Kaminski's actions on May 23, 2017, were in any way retaliatory or discriminatory on the basis of her race, sex, age, religion, or disability,  (*id.* at 161:7–163:17, ECF No. 20-1 at 102–04); and that she has no evidence that Kaminski had any knowledge about her EEOC charges or previous lawsuit, (*id.* at 155:19–156:13, ECF No. 20-1 at 96–97).  Again, Sherrod fails to demonstrate that any alleged harassment was based on her membership in a protected class.  This failure is fatal to her hostile work environment claim.

But even if Sherrod had been able to demonstrate such a connection, her hostile work environment claims fail because Sherrod cannot show that the harassment was so "severe or pervasive" that it altered her conditions of employment.  In determining whether the conduct is sufficiently severe or pervasive to be actionable, the Court looks at the totality of the circumstances, "including [1] the frequency of the discriminatory conduct, [2] how offensive a reasonable person would deem it to be, [3] whether it is physically threatening or humiliating conduct as opposed to verbal

abuse, [4] whether it unreasonably interferes with an employee's work performance, and [5] whether it was directed at the victim." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002)).

Here, there are only two events that could possibly show Allison's alleged harassment was severe or pervasive. First, as previously mentioned, on May 23, 2017, while Sherrod was in the middle of conducting a tool change, Kaminski told her to stop and instead sweep the floor. (ECF No. 23 at 7.) As instructed, Sherrod swept the floor. (*Id.*) She began to feel "light headed [sic] and short of breath," so she informed Kaminski, who then called an ambulance. (*Id.*) She was subsequently taken to the hospital. (*Id.*) Second, on March 29, 2017, Sherrod and a few coworkers filed a Group Employee Grievance, (ECF No. 20-2 at 41), against Allison management for "creating an unsatisfactory working condition in as much as the supervisor, Peter Kaminski, is constantly harassing the employees in [Department] 2F40," (*id.*)

Based on the totality of the circumstances, these two events fall short of showing that Allison's alleged harassment was so severe or pervasive that it altered Sherrod's conditions of employment. Even though Sherrod went to the hospital on May 23, 2017, as a result of having to sweep the floor at the direction of Kaminski, she admits that she "wasn't angry or upset" about having to sweep the floor, but, rather, thought "it was [a] dumb" request. (ECF No. 23 at 7.) This one-time task was not humiliating or offensive to Sherrod—far from severe or pervasive. Likewise, the filing of the Group Employee Grievance against Kaminski cannot be said to show Allison's alleged

harassment was severe or pervasive because the grievance did not allege harassment based on any protected characteristic, (Sherrod Dep. Tr. 357:12–359:11, ECF No. 20-1 at 274–76), and because it was ultimately withdrawn, (ECF No. 20-2 at 42).   In short, the alleged conduct was infrequent at best, was likely not offensive to a reasonable person (and merely "dumb" to Sherrod), was not comprised of any physically threatening or humiliating conduct, and was not alleged to have interfered with Sherrod's work performance.   Thus, based on the totality of the circumstances of *all* conduct Sherrod alleges is harassment on the part of Allison, the Court finds that Sherrod fails to show that Allison's alleged harassment was so severe or pervasive that it altered Sherrod's conditions of employment.

Because Sherrod has failed to demonstrate the elements required to prevail on a hostile work environment claim, Allison's Motion for Summary Judgment is **granted** as it relates to Sherrod's Title VII, ADA,[9] and ADEA[10] hostile work environment claims.

---

[9] The Seventh Circuit has recently stated that it "need not resolve whether a hostile work environment claim is cognizable under the ADA" when a plaintiff "does not establish a hostile work environment or any other adverse employment action," *Tarpley v. City Colls. of Chi.*, 752 F. App'x 336, 346 n.4 (7th Cir. 2018) (citing *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (citation omitted)), as is the case here.

[10] Hostile work environment claims under the ADEA are analyzed the same way as harassment/hostile work environment claims brought under Title VII.   *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (noting the Seventh Circuit Court of Appeals "has assumed, without deciding, that plaintiffs may bring hostile environment claims under the ADEA," and applying the same standard used to analyze hostile work environment claims brought under Title VII).

*E. Failure to Accommodate Claim*

Title VII prohibits employers from discriminating against employees and job applicants based on their religion.  42 U.S.C. § 2000e–2(a).  "To prove a Title VII claim for failure to accommodate religion, an employee must prove three things: (1) 'the observance or practice conflicting with an employment requirement is religious in nature;' (2) the employee 'called the religious observance or practice to [the] employer's attention;' and (3) 'the religious observance or practice was the basis for [the employee's] discharge or other discriminatory treatment.'"  *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (quoting *Porter v. City of Chicago,* 700 F.3d 944, 951 (7th Cir. 2012)).  "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter*, 700 F.3d at 951 (citing *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

It is undisputed that Sherrod established a *prima facie* case for failure to accommodate religion.  Allison, however, argues that it has met its burden of showing that it made a reasonable accommodation for Sherrod's religious practice.  Sherrod responds by alleging that Allison failed to accommodate her religious practices because Allison breached their written agreement.

On January 13, 2015, Allision and Sherrod entered into an agreement which states in part:

36

> Allison . . . hereby reaffirms its commitment to maintaining a workplace free of unlawful discrimination, harassment, and retaliation on the basis of . . . religion. Specifically, neither Allision nor its managers or supervisors will discriminate, harass, or retaliate against its employee Sherri Sherrod . . . on the basis of her . . . sincerely-held Seventh-day Adventist beliefs . . . . Allison will also continue to meet its obligation to accommodate Ms. Sherrod's sincerely held religious beliefs and practices consistent with the requirements of Title VII . . . . Should Ms. Sherrod experience any such harassment, discrimination or retaliation, she should report it immediately to Eula Seawood, HR . . . or any member of Allison's Labor Relations Department.

(ECF No. 23-5.)  In compliance with both Title VII and this written agreement, Allison provided Sherrod the following accommodations to avoid her having to work a Plan A Saturday: (1) using available vacation on a Friday or Monday preceding or following a Plan A Saturday, consistent with Allison's collectively-bargained vacation policies; (2) having a qualified coworker fill in for her on Plan A Saturdays; or (3) using her seniority to transfer to another shift or another department where Plan A Saturdays are infrequent.  (*See* Pence Notes to Sherrod, Ex. VI, ECF No. 20-3 at 76; McLaughlin Email, Ex. VII, ECF No. 20-3 at 77; *see also* Pence Decl. ¶ 31, ECF No. 20-3 at 6; Sherrod Dep. Tr. 69:1–10, 82:11–21, 173:4–11, ECF No. 20-1 at 26, 29, 115.)  Additionally, during periods for which there were six employees on day shift in Department 2F40, and there was sufficient coverage without Sherrod, Allison excused her from Plan A Saturdays without the need to find another hourly worker to cover the shift.  (Kaminski Decl. ¶¶ 4–5, ECF No. 20-4 at 1; Pence Decl. ¶ 34, ECF No. 20-3 at 6.)  Also, it seems that on the few occasions where Sherrod's own conduct put her at odds with the reasonable accommodations, the collective bargaining requirements and undue hardship to Allison, Allison further accommodated Sherrod through early

removal from her record of any ensuing discipline.  (*See, e.g.*, Pence Decl. ¶¶ 53, 56, ECF No. 20-3 at 10.)

"The reasonable accommodation requirement of Title VII is meant 'to assure the individual additional opportunity to observe religious practices, but it [does] not impose a duty on the employer to accommodate at all costs.'"  *Porter*, 700 F.3d at 951 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)).  "This means that a 'reasonable accommodation' of an employee's religious practices is 'one that eliminates the conflict between employment requirements and religious practices.'"  *Id.* (quoting *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (internal quotations omitted)).

The Court finds that Allison met its burden of showing that it made a reasonable accommodation for Sherrod's sincerely held Seventh Day Adventist beliefs.  Indeed, Allison offered Sherrod four options to avoid working Plan A shifts, which provided Sherrod with a reasonable accommodation.  *See, e.g.*, *Rodriguez v. City of Chicago*, 156 F.3d 771, 776 (7th Cir. 1998) ("[I]t is a reasonable accommodation to permit an employee to exercise the right to seek job transfers or shift changes . . . ."); *Rose v. Potter*, 90 F. App'x 951, 953 (7th Cir. 2004) ("Title VII does not require an employer to interfere with a valid seniority system in the interest of religious accommodation.") (citing *United States v. Airways, Inc. v. Barnett*, 535, U.S. 391, 403 (2002)); *EEOC v. Bridgestone/Firestone, Inc.*, 95 F. Supp. 2d 913, 928 (C.D. Ill. 2000) ("[A] system of voluntary swaps always depends on willing volunteers, yet courts have consistently found these systems to be reasonable accommodations, even when a swap was not

always possible.").  And although Sherrod preferred that she be excused from working any Plan A Saturday altogether and/or she be allowed to work after sundown on Plan A Saturdays, (Sherrod Dep. Tr. 175:6–177:7, ECF No. 20-1 at 116–18; *see also* Pence Decl. ¶ 35, ECF No. 20-3 at 7), Allison's offered accommodations were not required to "be the [Sherrod's] preferred accommodation[s] or the accommodation[s] most beneficial to [her]." *Porter*, 700 F.3d at 951 (quoting *Philbrook,* 479 U.S. at 69).

Therefore, Sherrod's argument that Allison "breached" the agreement by not allowing her to be excused from working *all* Saturdays, (Sherrod Dep. Tr. 177:4–10, ECF No. 20-1 at 118), is unavailing.  Similarly unavailing is any argument that her privacy or confidentiality was breached by Allison because some of her coworkers knew about her religious accommodation.  This is so because she admits that many of her coworkers and supervisors knew she was a Seventh Day Adventist; that she had asked a number of them to cover a Plan A Saturday on her behalf; and that her Union representatives were aware of the accommodations Allison had offered to her.  (*See* Sherrod Dep. Tr. 64:10–68:11, 177:11–178:5, 178:10-14, 180:9–182:11, ECF No. 20-1 at 21–25, 118–19. 121–23.)

Because Allison "offered an alternative that reasonably accommodated [Sherrod's] religious needs . . . 'the statutory inquiry is at an end[.]'"  *Id.* (quoting *Ilona,* 108 F.3d at 1576 (citations omitted)).  Thus, Allison's Motion for Summary Judgment is **granted** as it relates to Sherrod's failure-to-accommodate claim.

*F. Retaliation Claim*

To succeed on a Title VII, ADA, or ADEA retaliation claim, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (referring to Title VII retaliation claims); *see also Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) (stating the same standard applies to ADEA claims); *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) (stating the same standard applies to ADA claims). "When the plaintiff establishes a prima facie case of retaliation, an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). "If the employer meets this burden, the plaintiff, to avoid summary judgment, then must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination." *Id.* (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).

Allison takes issue with the causation prong, arguing that Sherrod fails to provide evidence that establishes a causal connection between the alleged adverse actions and her filing of the EEOC charges or the previous lawsuit she filed against Allison in 2014. Similarly, Allision argues that Sherrod also fails to provide evidence that

her protected activity played any role in any action taken by it.  The undisputed facts support Allison and doom Sherrod's retaliation claims.

Sherrod alleges that Allison conspired to fire her by intimidating her, suspending her, and writing her up.  But her bald allegations rely solely on speculation or conjecture, clearly missing the mark she needs to defeat summary judgment on this issue. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).  For example, Sherrod states that the "write-ups, suspensions, and correspondences among management will prove that not only did [Allison] try not to comply but that it was the complete opposite being a conspiracy for the demise of my employment," (ECF No. 23 at 3); that "Joe Hooker was subtle.  He wasn't very condescending[,] but he made it his business to fire [her]," (*id.* at 7); and that she "knew it was a conspiracy when [Cory Giocio] was introduced in the morning meeting . . . ," (*id.* at 5).  Yet she offers no admissible evidence to prove her assertions.  Instead, Sherrod admits that she has no evidence that any of Allison's employment actions were based on a retaliatory reason. (*See, e.g.*, Sherrod Dep. Tr. 126:7–128:3, 136:9–19 (Jones' actions), 161:7–163:17 (Kaminski's actions), 203:11–205:14 (October 3, 2017, DA), 216:24–218:25 (November 6, 2017, DA), 228:9–25 (November 11, 2017, DA), 235:20–239:19, 246:2–11 (January 22, 2018, DA), 270:12–271:5 (April 3, 2018, DA), 282:17–21 (termination), 310:20–311:2, 314:7–315:3, 316:5–317:12, 319:6–320:9, 324:8–17 (treatment of comparators), , ECF No. 20-1 at 68–70, 77, 102–04, 144–46, 157–69, 169, 175–80, 186, 211–12, 222, 250–52, 254–55, 257–58, 260–61, 264.)

Moreover, to the extent Sherrod relies on suspicious timing, her reliance on the timing is insufficient to prove the causation prong.  An examination of the timing of both Allison's and Sherrod's actions shows this.  On February 5, 2015, the Court dismissed her 2014 lawsuit.  (Order, *Sherrod*, No. 1:14-cv-00411-TWP-MJD.)  For more than three years following the dismissal of the 2014 lawsuit, Sherrod remained employed with Allison and filed no additional charges or lawsuits.  (Sherrod Dep. Tr. 92:20–25, ECF No. 20-1 at 49.)  However, on March 2, 2018, Sherrod filed the 2018 Charge against Allison.  (2018 EEOC Charge, ECF No. 20-2 at 28–29.)  Then, on April 3, 2018, Sherrod had checked off completing a "TAQC" chart for two machines but failed to record the underlying measurement for one machine.  (Pence Decl. ¶ 57, ECF No. 20-3 at 10–11.)  Notably, she could have been terminated for this incident, but was instead given a suspension, and the undisputed facts show that Pence's decision to issue her the suspension was not based in any way on Plaintiff's race, sex, religion, age, any disability, or the fact that she filed EEOC Charges or lawsuit against Allison.

Over nine months later, Sherrod's final incident occurred, on January 23, 2019.  After the incident, Sherrod went back on medical leave from January 31 to April 3, 2019; and on the day she returned from leave, Pence conducted a DI and ultimately terminated her employment.  This timeline dooms Sherrod's retaliation claims.  Indeed, the Seventh Circuit has held that "extended time gaps alone militate against allowing an inference of causation based on suspicious timing," *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012), because timing will "rarely be sufficient in

and of itself to create a triable issue, *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

Construing all facts and reasonable inferences in the light most favorable to Sherrod, she simply does not establish that Allision retaliated against her on the basis of race, sex, religion, age, disability or for filing complaints and lawsuits against Allision. And even if she had, Allison has met its burden of showing that it had legitimate non-discriminatory reason for taking the alleged adverse employment actions, and, based on the undisputed facts, Sherrod cannot establish that Allison's legitimate reasons were not its true reasons but rather were a pretext for discrimination, (*see supra* Section III.B). Therefore, Allison's Motion for Summary Judgment is **granted** as it relates to Sherrod's Title VII, ADA, and ADEA retaliation claims.

## IV. Conclusion

For the above reasons, Defendant's Motion for Summary Judgment (ECF No. 20) is **granted**. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 3/29/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

SHERRI SHERROD
7443 Hiner Ln
Indianapolis, IN 46219

Emmanuel V.R. Boulukos
ICE MILLER LLP (Indianapolis)
emmanuel.boulukos@icemiller.com

Charles Ellis Bush, II
ICE MILLER
charles.bush@icemiller.com

Kayla Ernst
ICE MILLER LLP (Indianapolis)
kayla.ernst@icemiller.com